## Case No. 10,553.

### The OREGON.

[1 Deady. 179.]

District Court, D. Oregon. July 7, 1866.

CARRIERS — DELIVERY TO INTERMEDIATE TRANSPORT VESSEL—DELIVERY TO VESSEL ON WHARF.

1. Where an ocean steamer is making regular voyages to a port, and for any reason she is unable to reach such port, and the agent of her owner charters a steamboat to take the passengers and freight down a river to such steamer and bring back her cargo, a delivery of goods under such circumstances to the steamboat for the purpose of being conveyed by such steamer, is a delivery to the latter, and she is thenceforth bound for their safe carriage and timely delivery.

2. Where a vessel is discharging and taking on cargo at a wharf, a delivery of goods thereon by the direction of the master, for the purpose of carriage upon the same, is a delivery to such vessel, and her responsibility for the carriage and delivery thereof commences from that time.

[Cited in Pearce v. The Thomas Newton, 41 Fed. 108.]

In admiralty.

Lansing Stout. for libellant.
William W. Page. for claimant.

DEADY. District Judge. The libel in this suit was filed January 30. 1866, and alleges, that about January 28, 1865, the libellant. M. Mansfield, shipped a package containing furniture and clothing of the value of $1,172. on the steamship Oregon, at the port of Astoria in Oregon. to be delivered at San Francisco. California. in good condition—the perils of the sea excepted—and that by the negligence and misconduct of the master and his servants, the package was wholly lost. On April 3. John McCraken, as agent for the

---

1 [Reprinted from 19 N. B. R. 171, by permission.]

1 [Reported by Hon. Matthew P. Deady. District Judge. and here reprinted by permission.]

claimant, Ben. Holladay, answered the libel, denying that the package in question was ever delivered to the steamship or received by it or its officers; as also the value and quality of the goods alleged to have been in it. The answer also attempts to deny that any contract was made between the libellant and the master of the Oregon for the conveyance of this package from Astoria to San Francisco. But the language of the answer in this respect is wholly irrelevant to the charge in the libel, and does not controvert any allegation therein. It is as follows: "That the said steamship Oregon, whereof Francis Connor was master, neither on January 28, nor at any other time, made a contract with the master of said steamship, whereby he agreed in consideration," etc. As will be seen, this only denies a contract between the vessel and her master—a matter not alleged by the libellant, and with which he has no concern, let the fact be as it may. For the purposes of this suit, the answer must be construed to admit the contract as alleged in the libel. Besides, if it is found that the vessel received the package under the circumstances stated, the law will imply the contract to convey and deliver as alleged.

The facts in the case I find to be as follows: (1) That in January, 1865, the steamship Oregon was engaged in carrying passengers between Portland and San Francisco, and in the latter part of that month was expected to arrive at Portland, but ice being then in the river it was uncertain whether she would come up or not, and therefore McCraken, the resident agent of the vessel, employed the river steamboat Cascades to take the passengers and freight then at Portland, by the Wallamet.slough to the steamship at St. Helen, or wherever she should be found between there and Astoria, and bring up the Portland freight and passengers then on the Oregon; and that there was some doubt whether the Cascades would be able to get through to the steamship, in which event it was agreed between the agent and the shippers that the Cascades would return to Portland, and the latter must pay the expense of the attempted trip, but if she should reach the Oregon, then the former would pay the Cascades her bill for lighterage and charge it over upon the freight. (2) That the libellant was then in San Francisco, but his family were in Portland, where he had lived for several years, and that such family took passage on the Cascades for the Oregon, and at the same time B. L. Norden, the agent of libellant, shipped thereon thirty-one packages of merchandise marked diamond M, S. F., for which the purser of the Cascades gave him a receipt, specifying that they were "in good order" and at "shipper's risk and expense;" and that such packages contained household stuff, and were shipped as freight. (3) That the Cascades met the steamship a short distance below St. Helen, and the master of the latter being in doubt about the ability of reaching St. Helen with his vessel, directed both vessels to proceed to Astoria, because that was the only place below St. Helen at which there was a wharf, whereon to transfer the respective cargoes of the Cascades and Oregon. (4) That the wharf at Astoria was in charge of a third party, and had a small warehouse upon it, and the Cascades and Oregon arrived there in company on the afternoon of January 26; that the former discharged her freight upon the wharf, from whence it was passed through the warehouse to the steamship on the other side; that the steamship at first discharged her cargo upon the wharf also, but as soon as the Cascades was discharged she laid alongside the Oregon and received the freight of the latter directly on her deck; that the transfer of cargo continued through two nights and until January 28, when the Cascades returned to Portland and the steamship went to sea; and that no receipt was given by the Oregon to the agent of the libellant who accompanied his family to Astoria, nor to any other of the individual shippers, but one receipt was given to the Cascades for the whole number of packages according to the freight list of the latter. (5) That on February 2, the San Francisco agent of the steamship gave libellant a receipt for the freight and lighterage of his packages, and described them therein as thirty-one in number; but subsequently, on March 2, such agent endorsed on such receipt the return of $4.50 of such freight to the libellant, because as therein asserted, one of the packages had not been delivered. (6) That among the thirty-one packages shipped on the Cascades for the Oregon, and marked diamond M, was the package described in the libel, containing the articles of household furniture and wearing apparel therein described; that such package was the one not delivered to the libellant by the steamship at San Francisco; and that the contents thereof were of the value of $1.172.00.

In considering the question of the liability of the vessel for the missing package, I will first endeavor to ascertain the effect of the shipment on the Cascades. The rule insisted upon by the claimant that the vessel is not liable until the receipt of the goods, is of course admitted. But cargo may be received within the meaning of this rule before it is actually on deck. "The reception of the goods by the master on board the ship, or at a wharf or quay near the ship, for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, or seeming to have this authority by the action or assent of the owner or master, binds the ship to the safe carriage and delivery of the goods." 1 Pars. Mar. Law, 132. "The manner of taking the goods on board, and the commencement of the master's duty in this respect, depend on the custom of the particular place. More or less is done by the wharfingers or lightermen ac-

cording to the usage. If the master receive the goods at the quay or beach, or send his boat for them, his responsibility commences with the receipt." Conk. Adm. 151. Upon the facts of this case, I am of the opinion that the receipt of the goods by the Cascades was the receipt of them by the vessel, so as to bind her for their safe carriage and timely delivery, provided the Cascades was able to reach her. McCraken was the agent of the owner, and he chartered the Cascades as a lighter to take the freight to and from the Oregon. In legal effect this is the same as the master's sending his boat for the goods. In this respect the owner represented by Mc-Craken has as much authority in the premises as the master. That this was the understanding of all the parties at the time, is evidenced by the fact, that the vessel did not receipt separately for the goods to the individual shippers, but in gross to the Cascades, and also by the fact that the vessel paid the Cascades her bill and charged it over to the shippers as lighterage. The Cascades was treated by the master of the vessel as a lighter or boat in his employ. From the time of the meeting below St. Helen, the master of the Oregon controlled the movements of the Cascades, and instead of receiving the goods alongside in the river as was expected and given out when the latter left Portland, required her to proceed in company with the Oregon to Astoria for the convenience of the wharf. The cases of The Freeman, 18 How. [59 U. S.] 182, and The Yankee Blade, 19 How. [60 U. S.] 82, cited by counsel for claimant, are not in point.

But admitting for the moment that the delivery to the Cascades was not a delivery to the Oregon, was the missing package delivered from the former to the latter, at Astoria? There can be no doubt that the package was delivered to and received on the Cascades at Portland. Counsel for the claimant admit this, but insist that it was lost before it came to the Oregon, and that the latter is not responsible for such loss. There is no direct and explicit evidence that the package was discharged upon the wharf at Astoria, yet the inference from all the facts of the case is irresistible that it was. I am morally certain of it. Such a discharge was a delivery to the vessel. The Cascades, in any view of the matter, was not engaged in an independent voyage, but was attendant upon the Oregon. The Oregon was her destination down stream; and she went to this Astoria wharf under the direction and orders of the master of the vessel, as a convenient place for the vessel to receive this freight and deliver her upward-bound cargo. It was not convenient—perhaps not possible—for the vessel to receive this freight at once upon her decks. She must first discharge cargo. Therefore it was delivered to her upon the wharf. This was a delivery in the immediate vicinity of the vessel and in the presence of its officers; not only that, but at the place appoint-

ed by the master to receive the goods. In addition to this, Hoyt, the purser of the Cascades, testifies positively that the vessel receipted for the whole cargo of the former, package by package, and that such receipt corresponded with the freight list of the Cascades, from which the receipt given the libellant's agent, was prepared. This fact itself is primary evidence of a delivery to the Oregon. The whole includes all its parts, and a receipt of the whole of the cargo of the Cascades, includes the package in question, which is shown to have been upon her freight list, and delivered to her at Portland. True, this receipt may be incorrect in this respect, but the presumption is otherwise, and the burden of proof is upon the claimant to show wherein it is false, if at all. The only evidence opposed to this is the testimony of two or three officers of the vessel, who, on being interrogated upon the subject at this late day, answer that they do not now remember to have seen such a package put on board the Oregon. Mere negative testimony like this, is of little or no weight against well established facts or reasonable deductions therefrom. Besides the right of the libellant to recover, does not depend upon the fact of whether the package was actually put on board the vessel or not. From the time of its delivery upon the wharf at Astoria, it was delivered to the vessel. If, thereafter, it was left upon the wharf, or stolen therefrom, or dropped in the river while the freight was being handled, during the night, as is quite likely, the vessel would be liable to the libellant for the loss.

Upon the question of the value of this package, the libellant and his wife, are the only witnesses who have any direct knowledge. The goods contained in it, are alleged to have been of a fine quality and superior workmanship, such as are commonly used and worn by people of refined taste, and comparative wealth. It appears that some eight years ago the libellant lived in New York, and was in good circumstances. His subsequent failure would not affect the quality or quantity of his wife's clothing, owned by her before that time, but might induce her to preserve it with extraordinary care—at least such valuable articles as figured silk dresses, a velvet cloak and fine shawl. One of the claimant's witnesses testifies, that the wife of the libellant dealt with him some years in Portland, for dress and household goods, and that she always purchased the best article in the market. Nor do I think that damages for the loss of costly wearing apparel, are to be measured by what such articles might bring at auction, as mere second-hand clothing. What they were worth to the libellant and his family, and what it would cost to replace them, ought also to be considered. It must also be borne in mind that the claimant has the legal right to satisfy any decree which the libellant may obtain for the non-delivery of this package in legal tender notes, and that as he seriously contests this claim, he will most probably

satisfy such decree in that kind of lawful money which has the least commercial value. The libellant is entitled to recover the value of the goods, as set forth in his libel. with interest, at the rate of ten per centum on that amount, from the time of the non-delivery.

Decree, that the libellant recover $1,-342.62½, with costs and disbursements of suit.